Barnet, Judge,
reviewing the facts found to be established, delivered the opinion of the court:
On the 18th of May, 1898, the plaintiff entered into a contract with the Government to manufacture for the use of the Ordnance Department of the Army 50 segmental, tube wire-bound rapid-fire guns, of which the claimant, Brown, was the inventor, together with Navy rapid-fire gun mounts for the same. Twenty-five of these guns were to be of 5-inch and 25 of 6-inch caliber. The twenty-five 5-inch guns were to be paid for at $9,175 each, and the twenty-five 6-inch guns at $10,950 each, making a total contract price of $503,125.
The contract was subsequently annulled by the Government before any of the guns had been delivered. This suit is brought to recover the sum of $140,502.95, the amount alleged to have been expended toward the performance of the contract before its annulment. Of this sum $42,578.18 is *29 alleged to have been expended by the plaintiff, and the remainder by the Diamond Drill & Machine Co., the subcontractor at whose works the guns were to be manufactured for the fulfillment of the contract.
None of the guns ever having been delivered under this contract, as before stated, the question for decision in this case is whether the contract was ever legally annulled by the Government.
The contract provided that a sample gun of both calibers should be furnished by the plaintiffs and submitted to test, and that the acceptance of the guns by the Government would depend upon such test proving satisfactory. The clauses of the contract relating to this subject are as follows:
“ The first gun manufactured will be fired with full service charges of powder, such as that used in testing other rapid-fire guns of similar caliber, and with not more than the regular service pressures for endurance, and the gun must be fired for endurance 300 rounds or less as rapidly as practicable at the proving grounds of the manufacturers, commencing as soon as the gun is completed and continue firing as the department may require, 5 rounds to be fired with pressures of about 45,000 pounds, and shall not exceed 50,000 pounds, these to be included in but at close of the test, and the acceptance of the remainder of the same caliber will depend upon the type gun passing its test satisfactorily.,
“ The first gun made of the other caliber to be tested at the same place and passed upon in the same manner, without any unnecessary delay, and the acceptance of the remainder of the same caliber will depend upon the type gun passing its test satisfactorily.
“ Both gun and carriage must endure these tests in all- respects satisfactorily, both as to the strength of material and facility of operation.
í{; í{í «{•»{• íjí íj»
“ The work must pass the required inspection at all stages of its progress, and shall be inspected and passed upon at all times without any unnecessary delay, and be approved by the officers of the Ordnance Department before being accepted and paid for by the United States.”
The first complete gun with mount, etc., was to be deliv: ered for test within three months from the date of the contract, but several delays had been granted by the Government, so that the first gun was not tested till March 8, 1899. *30 The test was made under the inspection of Capt. Ira MaeNutt, of the Ordnance Office, on proving grounds provided by said Diamond Drill & Machine Co., near the company’s plant at Birdsboro, Pa. It is considered unnecessary to state here in detail just what occurred during this test, and it is only necessary to say that the findings show that while the gun passed some of the requirements satisfactorily, in others it did not. The breech bushing and jacket of the gun were cracked, the diameter of the gun fluctuated, there being both increases and decreases, changes in the cross-section of the bore from a round to an elliptical form, and other defects were disclosed as shown particularly in the findings.
These features disclosed by the test created an apprehension on the part of the ordnance officers of danger of rupture, and the Chief of Ordnance and the Secretary of War refused to accept the gun unless it was subjected to and would satisfactorily pass a further test of 100 rounds. In October, 1899, the claimants had a conversation with Maj. Smith, who had immediate charge of matters under this contract, in which he informed them that the gun appeared to have passed the test, and that they could go on with the completion of the contract. Shortly after the plaintiffs wrote the Chief of Ordnance, informing him of this conversation and requesting an official letter to the same effect. No response was made to this request. November 9, 1899. the Chief of Ordnance submitted to the Secretary of War the report of Capt. MacNutt on the test of the gun with an official indorsement thereon, stating in substance that while the gun apparently had met the contract requirements certain defects had developed during the test which should be remedied before acceptance, and suggesting that the gun be submitted to 100 additional rounds, and that the guns be modified so as to remedy these and any further defects which might be developed in these additional firings. This indorsement was approved by the Secretary of War November 30, 1899, and, pursuant thereto, on February 6, 1900, the plaintiffs were notified of this action. On February 9, 1900, the claimants wrote the Secretary of War asking that further action in the premises be suspended until they could be *31 heard, and stating that they had not assented to any modifications of the gun and objecting to the further test recommended, as above stated.
On May 16, 1899, while the construction of the type gun was in progress the plaintiffs had been requested by the Chief of Ordnance to present to him some mathematical calculations in reference to the qualities of the gun. Nothing was done in the matter by the plaintiffs until after the receipt by them of the above notification of February 6, 1900; but on February 17, 1900, they wrote the Chief of Ordnance, apparently in response to the above request, requesting the selection of a board to make the calculations requested, naming two members themselves and suggesting the name of Maj. Ingalls, of the War Department, as the third member of the board. The War Department acceded to this request, and Maj. Ingalls was assigned to said duty. The said board was practically a year in making their investigations, at the close of which they'made their report to the claimants, but not until after the annulment of the contract, as hereinafter stated. This report was, on the whole, favorable to the gun, but material defects were pointed out and modifications suggested.
On January 11, 1901, the Chief of Ordnance returned Capt. MacNutt’s report on the test of the gun to the Secretary of War with an indorsement recommending that his office be authorized to declare the claimants’ contract null and void because of the claimants having failed “ to comply with the requirements of the Secretary of War and in further accordance with the provisions of the contract.” This recommendation was approved by the Secretary of War, and the contract was annulled. The claimants appealed from this decision to the Secretary of War, but he refused to revoke this annulment.
It is contended by the claimants that the type gun successfully passed the test required by the contract, as shown by the facts connected with said test as well as by the statements and reports of those officers of the War Department who had that question to decide. It will be seen that the test of this gun was made in accordance with the terms of *32 the contract as to the number of rounds fired, the amount of pressure, etc., and while the Chief of Ordnance in his report to the Secretary of War said that the guns “ apparently met the contract requirements,” he said, in the same report, that a further test should be made to prove the gun satisfactory. This report is doubtless a little loose in expression, but it must be interpreted as a whole, and so interpreted shows that the gun was not in every respect satisfactory to this officer.
It may be well to pause here and discuss briefly to what officer of the War Department this gun must prove satisfactory and what latitude of discretion such officer would have in the premises. While the contract seems to be silent as to what officer should exercise this discretion, the parties seem to have interpreted it as leaving that subject to the Chief of Ordnance; and that is doubtless the way in which it should be construed, subject, however, perhaps to the Secretary of War, which question will be noticed later. The contract provided that the gun must pass “its test satisfactorily.” This, of course, did not mean satisfactorily to Maj. Smith or any other subordinate of the War Department, but satisfactorily to the highest authority if finally submitted to such authority.
An important question to be decided in this case is what effect should be given to the word “ satisfactorily ” as used in the contract in question. The contract provided in considerable detail the manner in which this test should be conducted and then said that the gun should pass this test “ satisfactorily.” Under the familiar rule in the construction of contracts some effect and meaning must be given to this word if not inconsistent with other provisions. It seems to us evident that it meant that the gun was not only to pass successfully through the ordeal to which it was to be subjected to the extent of being able to live through the 300 rounds and withstand the pressure to which it was to be called upon to endure but, in addition to that, its conduct during this test and its condition afterwards must be such as to be satisfactory to the proper officers of the Government. This does not signify that it could be rejected on account of *33 mere caprice or for other cause without just and reasonable foundation. If the gun passed through the test in reasonable compliance with the contract, it was the contract duty of the Government to accept it. Electric Lighting Co. v. Elder Bros., 115 Ala., 138; Greenberg v. Lumb, 129 N. Y. Supp., 182; Fechteler v. Whittemore, 205 Mass., 6; Exhaust Ventilator Co. v. Ry. Co., 66 Wis., 218.
As was said in Electric Lighting Co. v. Elder Bros., supra, “ In a case like the present one the party can not capriciously refuse to accept the work. He must be in good faith dissatisfied. He can not avoid liability by merely alleging that he is dissatisfied; he is bound to be satisfied when he has no reason to be dissatisfied; he must fairly and honestly test the work, exercising such judgment and capacity as he has. The dissatisfaction must not be capricious nor mercenary, nor result from a design to be dissatisfied; it must exist as a fact; it must be actual, not feigned; real, not merely a pretext to escape liability.” (Id., 153.)
In Greenberg v. Lumb, supra, the defendant had contracted to do certain work in a “ satisfactory maimer,” and in construing this phrase the court tersely said“ It was only bound to do the work in a manner that ought to satisfy.” It is unnecessary to say that we are not now discussing that class of cases where the acceptance of work performed under a contract is peculiarly a matter of fancy or taste and where a different rule prevails.
Of course the question of the passing of the test of the type gun had to be left to some one, and by the construction given to the contract this question was left to the Chief of Ordnance, and we do not think that the facts in the case show that he exercised this judgment in a capricious or unreasonable manner. In fact his judgment is in a measure confirmed by the report of the board which was practically selected by the claimants, for while reporting generally in favor of the gun they suggested certain necessary modifications in its construction. It follows from the foregoing that the Chief of Ordnance properly and rightfully required a test in addition to the one specified in the contract before approving the *34 gun. The gun not having proved satisfactory under the first test, under the rule as stated he doubtless had the right at that time to reject it altogether. He did not do this, but gave the claimants an opportunity for an additional test de hors the contract to prove the gun satisfactory. This was a favor to the claimants and one which he doubtless had the right to grant, and it became their duty to submit the gun to this further test or to have the gun rejected and the contract annulled.
As to the contention by the claimants that the officers of the War Department were guilty of bad faith during the initial performance of the contract in question, and particularly in its annulment, it is sufficient to say that we find nothing in the record which justifies us in coming to any such conclusion.
It is contended by the defendants that by the terms of the contract the decision of the Secretary of War on the appeal to him made by the claimants from the decision of the Chief of Ordnance was a finality and can not be questioned here. This contention is based upon the following provision of the contract:
“ If any doubts or disputes arise as to the meaning of anything in this or any of the papers hereunto attached and forming this contract, the matter shall be at once referred to the Chief of Ordnance, IJ. S. Army, for determination. If, however, the party of the first part shall feel aggrieved at any decision of the Chief of Ordnance, it shall have the right to submit the same to the Secretary of War, and his decision shall be final.”
We think any provision of a contract making the decision of any officer final should receive a strict construction, and by applying that rule to the clause quoted we do not think it should receive the construction asked for by the defendants. That provision relates in terms to the interpretation of the contract and doubtless could have been invoked if any question had arisen as to the kind of test required by the contract. But upon the broader question as to whether the gun had passed this test satisfactorily we do not think this clause has any application.
*35 To sum up the whole case in a few words, we think the. findings show that the Chief of Ordnance was justified in his action in requiring an additional test of the type gun, and the claimants not having complied with this requirement that the contract was properly annulled.
It follows from the foregoing that an order will be entered herein dismissing the petition.
All concur.